UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARK ANTHONY WILMOT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 12-40057-TSH |
| TARA TRACEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION
## ON DEFENDANTS' MOTIONS TO DISMISS

March 1, 2013

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff Mark Anthony Wilmot ("Wilmot") has brought this civil rights action

against the Massachusetts Department of Children and Families ("DCF") and various of

its employees, the Oxford Massachusetts Police Department and various of its members,

and the Town of Oxford, following their investigation of allegations of child abuse made

by the plaintiff's two adopted daughters against him on May 10, 2009.  The crux of the

Complaint is that the charges allegedly were obviously unfounded, but the defendants

nevertheless continued with their investigation.  In addition, the Oxford Police brought

criminal charges against Wilmot, which they pursued through trial.  Wilmot represented

himself at that trial and was acquitted.  Wilmot alleges that these actions caused him

significant emotional and financial harm and resulted in the disintegration of his family.

Wilmot has brought an 18 count *pro se* Complaint,[1] raising claims of violations of his constitutional rights, state law claims, and a claim for a declaratory judgment. This matter is presently before the court on four motions to dismiss brought by all the defendants. The DCF defendants have brought two motions to dismiss on behalf of the individual DCF employees (Docket Nos. 36 and 47)[2] and one on behalf of DCF itself (Docket No. 51). The Oxford Police Department, its employees and the Town of Oxford have brought a combined motion to dismiss (Docket No. 34).[3] By their motions, the defendants are seeking dismissal of all counts of the Complaint.

It is undeniable that the plaintiff is anguished over the events which transpired, and that he is extremely angry that his denials of wrongdoing were ignored, especially given his status as an approved foster and adoptive parent, and as a military veteran. Nevertheless, as the allegations of the Complaint make clear, the defendants were

---

[1] The original Complaint was filed on May 9, 2012, and an Amended Complaint was filed on May 14, 2012 (Docket No. 3) ("Compl.").

[2] The DCF's motion to dismiss (Docket No. 36) was brought on behalf of Tara Tracey, Mike Polenski, Kevin Foley, Rosie Alicea (whose status as a DCF employee is contested, but that is irrelevant for present purposes), Justine Tonelli, Jeff Fogle, Ken Carlo, James Burns, Candice Gemski, Susan Connelly (erroneously identified as Donnelly in the Complaint), Melody Peet, Jan Nisenbaum, Brendan Murray, and Angelo McClain. DCF employee Corinne Contarino was not included since it was unclear whether she had been served with the Complaint. After that issue was resolved, Ms. Contarino filed a separate motion to dismiss (Docket No. 47) raising her own arguments and joining in the other DCF employees' motion as well. All of these defendants will be referred to collectively as the "DCF defendants."

[3] The Oxford Police Department defendants' motion to dismiss (Docket No. 34) was brought on behalf of Michael Boss, Michael Hassett, Robert Greene, Alan Jesky, the Oxford Police Department and the Town of Oxford (collectively, the "Oxford defendants").

following their statutory and governmental obligations in pursuing the claims of abuse.

For all the reasons detailed herein, this court recommends to the District Judge to whom

this case is assigned that the motions to dismiss be ALLOWED.

## II.  <u>STATEMENT OF FACTS</u>

When ruling on a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), the

court must accept as true all well-pleaded facts, and give the plaintiff the benefit of all

reasonable inferences.  See <u>Cooperman v. Individual, Inc.</u>, 171 F.3d 43, 46 (1st Cir.

1999).  "Ordinarily, a court may not consider any documents that are outside of the

complaint, or not expressly incorporated therein, unless the motion is converted into one

for summary judgment."  <u>Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 267 F.3d

30, 33 (1st Cir. 2001).  "There is, however, a narrow exception 'for documents the

authenticity of which are not disputed by the parties; for official public records; for

documents central to plaintiffs' claim; or for documents sufficiently referred to in the

complaint.'"  <u>Id.</u> (quoting <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993)).  Applying

this standard to the instant case, the facts relevant to the motions to dismiss are as

follows.[4]

_____

[4]  In light of this standard, the court will not consider any new factual allegations made by the plaintiff in his "Declaration of Facts, Notice of Tainted & Corrupted Material, Concerning Case Interviews and Witness Statements 28 USC Sec. 1746" (Docket No. 28) or his "Declaration of Facts Concerning False Information About Being Arrested, and Perceptions Not Based On Reality" (Docket No. 44) or in other pleadings beyond those alleged in the Complaint.  This court has considered the legal arguments raised by Wilmot in his oppositions to the motions to dismiss: "Plaintiff's Consolidated Opposition to Defendants' Motions to Dismiss" (Docket No. 54) ("<u>Pl. Opp.</u>"); "Plaintiff's Opposition to the Department of Children and Families July 6th, 2012 Motion to Dismiss this Complaint" (Docket No. 56) ("<u>Pl. DCF Opp.</u>"); and "Plaintiff's Opposition to the

## Wilmot's Family

Plaintiff, Mark Wilmot, is a disabled military veteran who earned the title Master Sergeant, United States Marine Corps (retired). <u>Compl.</u> ¶ 41. At the time of the incident in question, Wilmot was married and had two adult biological sons, Donald and Preston. <u>Id.</u> ¶¶ 57, 66-69. He had also served as a certified foster parent in North Carolina, caring for as many as ten foster children without complaint. <u>Id.</u> ¶¶ 50-52. In 1999, Wilmot and his wife chose to adopt two girls for whom they had formerly been foster parents. <u>Id.</u> ¶¶ 53, 56. These two girls, referred to herein as KLW and DRW, are the ones who made the abuse charges discussed below. According to Wilmot, his family unit was fully intact, without controversy, until the allegations of abuse were made against him. <u>Id.</u> ¶¶ 61-62. In addition, he was a productive member of the community, without a prior criminal record. <u>Id.</u> ¶¶ 44, 65.

## The Allegations of Abuse

As of May 10, 2009, Wilmot and his wife lived with their sons Preston and Donald, Donald's wife Michelle, and the minor adopted daughters KLW and DRW. <u>Id.</u> ¶¶ 69, 73-75. According to Wilmot, Michelle, a former mental health counselor for the United States Army, was a mentally disturbed woman who reported that she suffered from PTSD as well as other mental health problems. <u>Id.</u> ¶¶ 71, 78-86. Nevertheless,

---

Motions to Dismiss: To Wit an Oath to Defend, and a Reasonable Person's View of Natural Meaning and Policy Consequences" (Docket No. 57) ("<u>Pl. Supp. Opp.</u>").

"Michelle was capable of presenting herself as a credible person as an outcome of her speech, bearing, and education, and experience as an Army medic." Id. ¶ 104.

Michelle, who had been living with the Wilmot family since March 2009, had become a sort of "big sister" to the two adopted girls. Id. ¶¶ 73-75. According to Wilmot, "[w]ithout full-knowledge and understanding of early-childhood contributive factors, or all that the adopted girls KLW and DRW had experienced in their life, Michelle developed a hypothesis, that because the two adopted girls did not 'appear normal', and because the girls were unhappy with the level and scope of [Wilmot's] parental guidance, that child abuse was occurring." Id. ¶ 87. Wilmot further claims that Michelle manipulated the girls and convinced them to bring abuse allegations against their adopted father so that she could get custody of them. Id. ¶¶ 85-108. There is no contention that any such alleged manipulation was known to the authorities when the initial complaints were made.

On May 10, 2009, Michelle brought the two girls to the Oxford Police Department. There Michelle, who "possessed good report writing skills," provided "a seemingly air-tight 'voluntary statement'" claiming that both girls had disclosed to her that Wilmot "had sexually, physically, and emotionally abused them for a period exceeding ten years." Id. ¶ 106. Moreover, Michelle reported that Wilmot had told the girls not to tell the police or school officials. Id. ¶ 108. The girls confirmed the abuse. See, e.g., id. ¶¶ 102, 128. The Oxford Police then contacted DCF in conformity with "the mandatory reporting requirements as set forth by Massachusetts state law." Id. ¶ 139. Since an

understanding of the statutory framework for investigating child abuse allegations is necessary to put the allegations of the Complaint in context, a brief overview follows.

## Procedures for Investigating Allegations of Child Abuse

DCF's procedures for investigating charges of child abuse are defined by statute and regulations.  Specifically, but without limitation, Mass. Gen. Laws ch. 119, § 51A requires specified persons, including the police, to report allegations of child abuse to the DCF (a "51A report") if they have "reasonable cause to believe that a child is suffering physical or emotional injury" as a result of abuse.  Mass. Gen. Laws ch. 119, § 51A(a).  This "reasonable cause" standard "serve[s] a threshold function, thereby implying a relatively low degree of accuracy."  Care & Protection of Robert, 408 Mass. 52, 63, 556 N.E.2d 993, 998-99 (1990).  "Therefore a presentation of facts which create a suspicion of child abuse is sufficient to trigger the requirements of § 51A."  Id. at 63, 556 N.E.2d at 999.

Pursuant to Mass. Gen. Laws ch. 119, § 51B, DCF must promptly investigate any 51A report.  If there is "reasonable cause" to suspect that the reported condition poses an immediate danger to the life, health, or safety of a child, an investigation must commence within two hours of the report, and an interim report with an initial determination must be completed within twenty-four hours.  Mass. Gen. Laws ch. 119, § 51B(c); 110 C.M.R. § 4.31(1).  During this "51B investigation," DCF may take a child into temporary custody when it "has reasonable cause to believe that removal is necessary to protect a child from abuse or neglect[.]"  Mass. Gen. Laws ch. 119, § 51B(e).

Once the 51B investigation is completed, DCF must determine whether the 51A report is "supported" or "unsupported." 110 C.M.R. § 4.32(1). There is a right to an administrative appeal of this decision, followed by an appeal to the Massachusetts Superior Court. See id. §§ 10.06, 10.08, 10.10; Mass. Gen. Laws ch. 30A, § 14. DCF will conclude that the 51A report is "supported" if there is "reasonable cause" to believe that a child was abused or neglected. 110 C.M.R. § 4.32(2). "To support a report does not mean that the Department has made any finding with regard to the perpetrator(s) of the reported incident of abuse or neglect. It simply means that there is reasonable cause to believe that some caretaker did inflict abuse or neglect upon the child in question." Id. Depending on the circumstances, DCF is required to, or may exercise its discretion and, report the matter to the district attorney's office. See Mass. Gen. Laws ch. 119, § 51B(k); 110 C.M.R. §§ 4.50-4.53.

Once a 51A report is found to be "supported," DCF opens a new case for services, and the Department undertakes a full assessment of a family's needs, along with "evaluations of risk to children," which is to be completed within 45 working days after the initial contact. 110 C.M.R. §§ 5.02-5.04. A "Service Plan" describing the changes needed, tasks to be undertaken and services provided is drafted if necessary. Id. § 6.01.

As a general rule, every 51A report is entered into a DCF Central Registry unless certain conditions apply. See Mass. Gen. Laws ch. 119, §§ 51B(h), 51F (setting forth certain confidentiality provisions). Access to the Registry is limited. 110 C.M.R. § 4.35. As detailed more fully below, there is an administrative procedure for challenging entries

in the Registry.  Covell v. Dep't of Soc. Servs., 439 Mass. 766, 787-88, 791 N.E.2d 877, 893 (2003).

As alleged in the Complaint, the actions taken by the DCF defendants and the Oxford defendants were in accordance with these statutory procedures.

### Investigation of KLW's and DRW's Allegations

When the Oxford Police contacted DCF on May 10, 2009, the report was received by DCF supervisor Justine Tonelli, who soon determined that the allegations against Wilmot amounted to an "emergency condition" calling for an immediate investigation under the procedures described above.  See Compl. ¶¶ 139, 142-43.  She then assigned Mike Polenski and Kevin Foley, both DCF social workers, to conduct the initial investigation.  Id. ¶¶ 8-9, 144.  Foley and Polenski went to the Wilmot residence that afternoon.  Id. ¶ 148.  Wilmot was not present, but the social workers interviewed his wife, who allowed them to enter the home.  Id. ¶¶ 151-53.

Wilmot spoke to one of the social workers by phone, who informed him that an investigation of abuse was being conducted.  Id. ¶ 154.  Wilmot denied any abuse, and indicated that he wanted to meet with DCF the following day, along with his lawyer.  Id. ¶¶ 156-57.  "Upon information and belief," the social worker "ordered [Wilmot] not to return home under threat and penalty that his children would be taken away."  Id. ¶ 160. In addition, Wilmot was ordered not to speak with his children while the investigation was ongoing.  Id. ¶ 163.

The next day, May 11, 2009, DCF preliminarily determined that the claim of sexual abuse was unsupported, but that the claim of physical abuse was supported. Id. ¶¶ 184-85, 195-96. In particular, the claim of physical abuse focused on one incident when Wilmot allegedly "grabbed his adoptive daughter by the hair, then forced the daughter up the home's stairs" and another incident when he "allegedly pulled his other daughter's hair and pushed her toward the stairs[.]" Id. ¶ 176. Wilmot's wife denied that any abuse had occurred, and neither daughter had reported any injuries at the time. Id. ¶¶ 177, 192. Wilmot admits the incidents, but contends that he was "using the safe physical movement method" that he had been taught as a foster parent. Id. ¶ 185.

As part of their investigation, the DCF social workers acknowledged that Wilmot was willing to speak with them, but only with his attorney present. Id. ¶ 188. In light of the conclusion that the claim of physical abuse was supported, Wilmot's name was placed in the DCF's Central Registry. Id. ¶ 196. He apparently never appealed his inclusion in the Registry.

According to Wilmot, Alan Jesky of the Oxford Police Department ran a CORI/Records check as part of the investigation, and accepted the CORI record belonging to Mark Wilmot of Arlington, Massachusetts, not the plaintiff Mark Wilmot of North Oxford. Id. ¶¶ 132-134. The other Mark Wilmot had a prior arrest record for failing to obey a police officer, assault and battery on a police officer, and resisting arrest. Id. ¶ 135. This CORI record, which was included in the plaintiff's file when criminal

charges were brought against him, allegedly negatively colored the Oxford Police's view of the plaintiff without justification.  Id. ¶¶ 136-37.

On May 13, 2009, "a multidisciplinary team of trained professionals" from the Oxford Police Department, the District Attorney's Office and DCF participated in a Sexual Abuse Intervention Network ("SAIN") interview with Wilmot's two adopted daughters.  Id. ¶¶ 206-07.  This did not change the previous assessment that no sexual abuse had taken place.  Id. ¶ 207.  However, on May 28, 2009, the boyfriend of one of the girls reported that she had told him that she had been sexually abused.  Id. ¶ 209.  Officers Robert Greene and Michael Hassett of the Oxford Police Department conducted a follow-up interview with the girl, who denied that she had made any such statement or that she had been sexually abused.  Id. ¶ 210.

On June 3, 2009, Tara Tracey, another DCF social worker, spoke with Officer Greene about whether Wilmot would be charged with indecent assault and battery.  Id. ¶¶ 10, 213.  On June 11, 2009, Tracey spoke with employees at the schools which the girls attended.  Id. ¶ 218.  While she was told that there had not been any reports or signs of concern at school, it was reported that one daughter's appearance had "changed drastically."  Id.  Tracey received additional calls on June 18, 2009 and June 22, 2009 reporting that one of the daughters was not doing well, was engaging in bizarre behavior and was having difficulties with her peers.  Id. ¶¶ 222-23.  In addition, Mrs. Wilmot called asking for a meeting as soon as possible, with counsel present, as it had been

"more [sic] than six weeks since her husband had been displaced from their home" and "this situation cannot continue."  Id. ¶ 220.

Tracey then met with her supervisor James Burns, and area program manager Candice Gemski "to discuss the current status and case direction."  Id. ¶ 224.  They recommended that Wilmot's daughters engage in treatment "specific to victims of sexual abuse," and that Wilmot engage in a sexual offenders evaluation.  Id. ¶ 225.  Tracey was further directed to continue to attempt to contact the attorney the Wilmots had hired to arrange a meeting.  Id. ¶ 226.

On June 30, 2009, Tracey spoke with the Wilmots' counsel, who said that the charges were "devastating to the family" and reasserted that no abuse had taken place.  Id. ¶ 227.  On July 8, 2009, Tracey met with the Wilmots and their counsel "to discuss the ongoing DCF involvement with the family."  Id. ¶ 229.  Wilmot denied any abuse and stated that one of his daughters had recanted her claim and said she had been coached into making the original allegation.  Id. ¶¶ 229-31.  During the meeting, counsel informed Tracey that Wilmot had been arrested on July 3, 2009 based on a warrant issued by the Oxford Police.  Id. ¶ 231.  In light of the arrest, DCF would not agree to allow Wilmot to return home at that time.  Id.  DCF proposed a treatment plan that required Wilmot to submit to a "sex offender evaluation" and for the family to enter into a Service Plan.  Id. ¶¶ 232-33.

It is undisputed that Wilmot was arraigned in Dudley District Court on two counts of assault and battery and one count of indecent assault and battery on a child under 14.

DCF Mem. (Docket No. 37) at Ex. 1.[5]  Wilmot was released on conditions, including an order that he stay away from his adopted daughters.  Id.  Wilmot represented himself at the jury trial of these charges, and, on July 20, 2010, was found not guilty on two charges, with the third being dismissed at the request of the government.  Id.; Compl. ¶¶ 245, 250.

### Wilmot's Claim of Harm

Wilmot contends generally that the defendants failed to properly investigate the charges of abuse, and had they done so would have immediately concluded that the charges were unfounded.  Moreover, he takes strong exception with the way the investigation was handled, the fact that it allegedly continued despite the lack of any proof, and his exclusion from his home on the basis of what he asserts were unsubstantiated allegations.  In particular, but without limitation, he objects to the fact that he was not interviewed until weeks after his exclusion from his home, and contends that his sons were never interviewed at all.  Wilmot also objects to his inclusion in the Central Registry.  He further objects to the fact that criminal charges were brought against him, and especially that he was charged with indecent assault despite the fact that the allegations of sexual abuse had been found to have been "unsupported" by DCF.  As a result of all these events, Wilmot contends that his record was tarnished and it affected his ability to interact with children in sports and other areas which would involve a background check.

---

[5]  The court may properly consider these public records in connection with a motion to dismiss without converting it into a motion for summary judgment.  Watterson, 987 F.2d at 3-4.

In general, Wilmot contends that these events have led to the unreasonable loss of his good reputation in the community, and have led to "feelings of sheer terror, anxiety, and anger over his mistreatment by public servants[.]"  Id. ¶ 167.  He also lost the opportunity to develop business opportunities involving sports with children.  See id. ¶¶ 198, 203, 205.  Moreover, according to Wilmot, these events have allegedly led to his wife's leaving him, the degradation of the health and mental well-being of all the family members, and to five children being born to his adopted daughters before they were 18, among other significant harm.  Id. ¶¶ 35, 37, 240-41, 167, 258-59.

Additional facts will be provided below where appropriate.

### III.   ANALYSIS - OVERVIEW

### Causes of Action

The defendants are seeking to dismiss all counts of the Complaint on various grounds.  With respect to the DCF defendants, Count I purports to state a claim under 42 U.S.C. § 1983 for a "violation of plaintiff's right to family integrity" against the defendants Polenski, Foley, Tracey, Burns and Gemski, Count II purports to hold these defendants jointly and severally liable under Count I, and Count III seeks exemplary damages for Count I.  Similarly, Count IV purports to state a claim under 42 U.S.C. § 1983 against the same defendants based on a "violation of plaintiff's right to privacy," while Count V seeks to hold the named defendants jointly and severally liable under Count IV, and Count VI seeks exemplary damages for Count IV.  Count VII purports to state a claim of supervisory liability under 42 U.S.C. § 1983 against the DCF defendants

Burns, Gemski, Connelly and McClain, Count VIII purports to state a claim of intentional/negligent infliction of mental distress against all DCF defendants, and Count XVIII seeks a declaratory judgment against all the defendants to the effect that after DCF makes a finding that no abuse or neglect occurred, no criminal charges based on the same facts can be brought.  See Compl. ¶ 324.

With respect to the Oxford defendants, Count IX purports to state a claim under 42 U.S.C. § 1983 against Greene and Hassett based on a claim of false arrest, while Count X seeks to hold them jointly and severally liable, and Count XI seeks exemplary damages for the same conduct.  Count XII is also against defendants Greene and Hassett under 42 U.S.C. § 1983, and is based on a claim of malicious prosecution, Count XIII seeks to hold these defendants jointly and severally liable for the conduct alleged in Count XII, and Count XIV seeks exemplary damages for the same conduct.  Count XV against Greene and Hassett is identical to Count XII, but presumably is intended to be a common law claim of malicious prosecution.  Count XVI purports to be a claim of intentional/negligent infliction of mental distress against Greene and Hassett.  In Count XVII, Wilmot purports to bring a claim under 42 U.S.C. § 1983 for municipal liability for Fourth Amendment violations against the Town of Oxford.  Finally, as detailed above, in Count XVIII, Wilmot is seeking a declaratory judgment.

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the motions to dismiss be ALLOWED.

## Standard of Review - Motion to Dismiss

Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings. Thus, when confronted with a motion to dismiss, the court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff.  Cooperman, 171 F.3d at 46.  Dismissal is only appropriate if the complaint, so viewed, fails to allege a "plausible entitlement to relief."  Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)).

Two underlying principles must guide the court's assessment as to the adequacy of the pleadings to support a claim for relief.  Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009).  "'First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' Such conclusory statements are 'not entitled to the assumption of truth.'"  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (internal citations omitted)).  "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.'"  Id. (quoting Iqbal, 556 U.S. at 679, 129 S. Ct. at 1949).  "This second principle recognizes that the court's assessment of the pleadings is 'context-specific,' requiring 'the reviewing court to draw on its judicial experience and common sense.'  '[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not

show[n] – that the pleader is entitled to relief.'" Id. (quoting Twombly, 556 U.S. at 679, 129 S. Ct. at 1950) (internal citations omitted; alterations in original)).

### Standard of Review - § 1983 Claim

Wilmot has brought claims under 42 U.S.C. § 1983 alleging violations of his constitutional rights. Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quotations and citation omitted). It provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.

"A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997), cert. denied, 522 U.S. 819, 118 S. Ct. 71, 139 L. Ed. 2d 32 (1997). In the instant case, the defendants do not dispute that they were acting under color of state law in connection with the events at issue. However, they contend that their conduct did not deprive the plaintiff of his constitutional

-16-

rights, and that even if they acted unlawfully, they are entitled to qualified immunity with respect to Wilmot's civil rights claims.

## Standard of Review - Qualified Immunity

The individual defendants have asserted defenses of qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). It applies where, as here, the governmental official is engaged in the performance of discretionary functions. Harlow, 457 U.S. at 818, 102 S. Ct. at 2738; see Kauch v. Dep't for Children, Youth & Their Families, 321 F.3d 1, 3 (1st Cir. 2003) (DCF employee was "entitled to raise qualified immunity as a defense" to a suit under 42 U.S.C. § 1983 arising out of her investigation of a charge of abuse). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson, 555 U.S. at 231, 129 S. Ct. at 815 (quotations and citations omitted). Thus, qualified immunity "protects all but 'the plainly incompetent and those who knowingly

violate the law.'" Pagan v. Calderon, 448 F.3d 16, 31 (1st Cir. 2006) (quoting Malley v.

Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986) (internal

punctuation omitted)).

The determination whether an official is entitled to qualified immunity requires an

assessment as to whether the facts alleged or shown by the plaintiff "make out a violation

of a constitutional right" and, if so, "whether the right at issue was clearly established at

the time of defendant's alleged misconduct." Pearson, 555 U.S. at 232, 129 S. Ct. at 816

(citing Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272

(2001) (additional quotations and citations omitted)).  A court has "discretion in deciding

which of the two prongs of the qualified immunity analysis should be addressed first in

light of the circumstances in the particular case at hand." Id. at 236, 129 S. Ct. at 818.

"[T]he second, 'clearly established' step of the qualified immunity analysis . . . in

turn, has two aspects." Maldonado, 568 F.3d at 269.  As the First Circuit has described:

> One aspect of the analysis focuses on the clarity of the law at the
> time of the alleged civil rights violation.  To overcome qualified
> immunity, the contours of the right must be sufficiently clear that a
> reasonable official would understand that what he is doing violates
> that right.  The other aspect focuses more concretely on the facts of
> the particular case and whether a reasonable defendant would have
> understood that his conduct violated the plaintiffs' constitutional
> rights.  Indeed, it is important to emphasize that this inquiry must be
> undertaken in light of the specific context of the case, not as a broad
> general proposition.

Id. (quotations, citations and alterations omitted).  Thus, "the relevant, dispositive inquiry

in determining whether a right is clearly established is whether it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted."  Id. (quotations, citations and alterations omitted).

## IV.   CLAIMS AGAINST DCF DEFENDANTS

### A.   Section 1983 Claims Against the DCF Employees (Counts I-VI)

In Counts I-III, Wilmot contends that the defendants Polenski, Foley, Tracey, Burns and Gemski violated his "right to family integrity" by, on or about May 10, 2009, causing his separation from his family and depriving him of liberty, without any right or authority to do so, and by intruding into his personal affairs without reasonable basis after he had advised them that he had committed no crime or offense, and had offered to prove his innocence.  Compl. ¶¶ 266, 268.  In Counts IV-VI, Wilmot contends that these defendants, on or about May 11, 2009, invaded his "right to privacy from intrusive government action," deprived him of liberty, without any right or authority to do so, and intruded into his personal affairs without reasonable basis.  Id. ¶¶ 275, 277.  All of these actions allegedly violated Wilmot's constitutional rights as guaranteed by the Fourth, Fifth and Seventh Amendments and Section 1 of the Fourteenth Amendment of the United States Constitution.  Id. ¶¶ 269, 271, 278, 280.  Thus, he has brought these claims under 42 U.S.C. § 1983 seeking to enforce his constitutional rights.

In particular, Wilmot is challenging the manner in which the investigation of the abuse allegations was conducted, including his separation from his family, his inclusion in the Central Registry despite no finding of wrongdoing, the warrantless entry into his home by the DCF employees, and his arrest and prosecution.  Reading his Complaint

liberally, Wilmot is alleging that the DCF defendants violated his due process rights "to family integrity" as guaranteed by the Fourteenth Amendment due to his status as a custodial parent, his right to privacy and reputation as guaranteed by the Fourteenth Amendment, and his Fourth Amendment right to be free from unreasonable searches and seizures.[6]   As detailed herein, these claims should be dismissed either because Wilmot has not alleged sufficient facts to state a claim that there was a violation of his constitutional rights or because the defendants are entitled to qualified immunity.

### The Investigation

Wilmot claims that the DCF employees violated his substantive due process rights in connection with the care and raising of his children.  "This right, 'among the most venerable of the liberty interests embedded in the Constitution,' is protected by the Due Process Clause."  Kauch, 321 F.3d at 4 (quoting Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 20 (1st Cir. 2001)).  Nevertheless, the right has never been absolute.  Rather, "the protection afforded to the parents' interests must be balanced against other valid interests, particularly the best interests of the child and the interest of society in the maturation of children as future citizens."  Hatch, 274 F.3d at 20. Moreover, it is well established that "[t]here is no constitutional right to be free from

---

[6]   While Wilmot also references his Fifth and Seventh Amendment rights, see Compl. ¶ 269, and argues in passing that the defendants have violated his Fourteenth Amendment right to equal protection under the law and his "right to access to the Courts under the 4th Amendment," these claims are not developed either factually or legally.  See Pl. Opp. at 3.  Consequently, they will not be discussed further.  See Pease v. Burns, 719 F. Supp. 2d 143, 151 (D. Mass. 2010), and cases cited.

child abuse investigations." <u>Kauch</u>, 321 F.3d at 4.  In light of the government's

"compelling interest in the welfare of children," "the relationship between parent and

child may be investigated and terminated by the state provided constitutionally adequate

procedures are followed." <u>Watterson</u>, 987 F.2d at 8.

"Because the welfare of the child is paramount, an objectively reasonable suspi-

cion of abuse justifies protective measures." <u>Hatch</u>, 274 F.3d at 21.[7]  In the instant case,

applying this standard makes it clear that the allegations of the Complaint do not rise to

the level of a violation of Wilmot's due process rights.  The initial report of sexual and

physical abuse was made by two young women who, while minors, were old enough to

describe their complaints.  They were accompanied by Wilmot's daughter-in-law who

reported the alleged abuse and who, by Wilmot's own admission, was articulate, present-

able, and able to write an "air-tight" report.  Under such circumstances, even though

Wilmot himself may have had a stellar reputation, DCF was justified in initiating the

investigation.

Further, the actions of Polenski and Foley in conducting the 51B investigation,

which resulted in the threshold determination that there was "reasonable cause" to

support the 51A report as to physical abuse, did not violate Wilmot's constitutional

---

[7]  Wilmot argues, relying in part on Ninth Circuit law, that a higher standard, akin to probable cause, should apply before the state can assume temporary custody of a child in the face of a charge of abuse.  <u>See</u> <u>Pl. Opp.</u> at 4.  In the instant case, at no time did DCF seek custody of the children.  Moreover, as the <u>Hatch</u> court held, the Ninth Circuit's "minority view" "sets the bar too high" and is not the law of the Commonwealth of Massachusetts.  <u>Hatch</u>, 274 F.3d at 21.

rights.  Despite Wilmot's strong objection, Polenski and Foley were justified in asking

Wilmot not to return to his home while the initial investigation was taking place.  DCF

has the right to temporarily remove children when faced with reasonable evidence of

abuse.  See Kauch, 321 F.3d at 4 ("a case worker may take temporary custody of a child

without a hearing, when the case worker has a reasonable suspicion that child abuse has

occurred (or, alternatively, has a reasonable suspicion that a threat of abuse is imminent)"

(internal citation and punctuation omitted)).  Giving a parent the option of leaving the

home, and allowing the children to stay with the other custodial parent, is a reasonable

alternative and is not unconstitutional.  See Hopkins v. Rhode Island, 491 F. Supp. 2d

266, 273-74 (D.R.I. 2007) (even if case worker's suspicions turned out to be wrong,

asking parent to leave home during investigation of claims of sexual and physical abuse

was appropriate where there was some evidence of physical punishment, although sexual

abuse was denied by children); Garfield v. McLaughlin, No. 09-11617-GAO, 2012 WL

474126, at *3-4 (D. Mass. Feb. 13, 2012) (no constitutional violation where DCF social

workers told plaintiff that either he could leave the premises or they would take the child

to foster care when they came to investigate report of child abuse).[8]

---

[8]  Wilmot's continued absence from the home pending the investigation and his criminal
trial was apparently in accordance with the conditions of release set by the District Court, and
cannot be attributed to the DCF social workers.  In any event, DCF is authorized by statute to
take 45 business days to assess the situation further and develop an appropriate plan after the
initial finding that a claim of abuse is supported.  110 C.M.R. §§ 5.02-5.04.  It appears from the
Complaint that the DCF employees acted in accordance with this schedule.

Wilmot argues that the actions of Polenski and Foley in entering his home to investigate the allegation of abuse without a warrant violated his Fourth Amendment rights.  This argument too is without merit.  As an initial matter, according to the Complaint Mrs. Wilmot consented to having Polenski and Foley enter the home, thereby negating the claim of a Fourth Amendment violation.  Although Wilmot seeks to circumvent such consent by alleging that his wife was shocked by the appearance of the DCF employees, see, e.g., Compl. ¶ 149, there is no allegation that Mrs. Wilmot was physically threatened or otherwise rendered incompetent to give her permission, and she, herself, has not raised such a claim.  The fact that the social workers may have advised Mrs. Wilmot of the seriousness of the situation, or of their right to conduct an investigation, or even of their right to remove the children, does not negate Mrs. Wilmot's consent.  See Donald M v. Matava, 668 F. Supp. 703, 712 (D. Mass. 1987) ("in the context of searches and seizures it has been held that a good faith assertion by a police officer that he would seek a warrant if the suspect did not consent to a search did not make the suspect's subsequent consent involuntary"), and cases cited.  Thus, the allegations of the Complaint do not support a claim of a violation of Wilmot's Fourth Amendment rights.

Moreover, under the facts as alleged, it is not clear that a warrant was necessary. A warrantless entry into a home to investigate an allegation of ongoing child abuse could either fall within the "exigent circumstances" exception to the Fourth Amendment warrant requirement, or within that class of warrantless searches deemed reasonable "if conducted in furtherance of an important administrative or regulatory purpose, or 'special

need,' which would be undermined systemically by an impracticable warrant or probable-cause requirement." McCabe v. Life-Line Ambulance Serv., Inc., 77 F.3d 540, 545 (1st Cir. 1996). The information provided to DCF by Michelle and the two girls was that the girls had been physically and sexually abused by their father, and that the abuse was ongoing, thereby making a prompt entry into the home necessary. If a warrant was not necessary, there is no basis for a claim that Wilmot's Fourth Amendment rights were violated.

Finally, under the facts as alleged, even if a warrant was needed, the claim must be dismissed. In the absence of a clear cut prohibition of the entry by social workers to investigate allegations of imminent abuse, the defendants would be entitled to qualified immunity for any alleged wrongdoing. See Donald M, 668 F. Supp. at 709 (social workers entitled to qualified immunity on charge of Fourth Amendment violation due to warrantless entry into home to investigate child abuse). Thus, the Complaint fails to state a claim based on the warrantless entry into the Wilmot home.

The fact that the investigation continued after the initial assessment also fails to state a claim of a violation of Wilmot's constitutional due process rights. As alleged in the Complaint, Wilmot himself agrees that there was evidence of physical force being used with the two girls, although he contends that the force was appropriate. In addition, there are allegations in the Complaint that DCF was informed after its initial assessment that the boyfriend of one of the girls reported that she said she had been sexually abused. Compl. ¶ 209. Furthermore, DCF had information about changes in one of the girl's

behavior, attitude and dress, and of general problems.  Id. ¶¶ 218, 222-23.  The DCF

defendants had "an objectively reasonable suspicion of abuse," which justified continued

investigation.  Hatch, 274 F.3d at 21.  Thus, under the facts as alleged, there was no

violation of Wilmot's constitutional rights.

        In any event, the DCF defendants are entitled to qualified immunity for their

actions in pursuing the abuse investigation against Wilmot.  It does not matter if their

"suspicion was ultimately determined to be unfounded" or that "they were perhaps over-

zealous" in their investigation.  Hopkins, 491 F. Supp. 2d at 273-74.  See also Kauch, 321

F.3d at 4-5 (constitutional right to family integrity was not violated where social worker

had "reasonable suspicion" that there had been abuse when she filed petitions that led to

supervised visitation, even though charges later proved to be unfounded).  Wilmot's

objections that all persons with knowledge were not interviewed, or that DCF failed to

consider that he had been approved as a foster and adoptive parent, do not compel a

different result.  The fact that the investigation was not perfect does not rise to the level

of a constitutional violation or prevent the DCF's employees from being granted qualified

immunity.  See, e.g., Hatch, 274 F.3d at 24-25 (social worker entitled to qualified

immunity in connection with the temporary removal of a child while investigating charge

of abuse, where social worker had sufficient reliable information to support a reasonable

suspicion of abuse even though a number of persons with knowledge, including the

alleged abuser, had not been interviewed, and much of the reliable evidence was

hearsay); Watterson, 987 F.2d at 8-9 (even if therapist who participated in abuse investi-

gation was negligent and erroneously reported abuse, such conduct "is insufficient to constitute a deprivation of due process of law"); Frazier v. Bailey, 957 F.2d 920, 930-31 (1st Cir. 1992) (social workers entitled to qualified immunity in connection with investigation of abuse charge "[b]ecause the right to family integrity has not been so particularized as to put defendants on notice that their conduct was unlawful").  "Public policy encourages a case worker, when presented with evidence of apparent child abuse, to act in the interest of an imperilled child – and it is better to err on the side of caution than to do nothing and await incontrovertible proof."  Kauch, 321 F.3d at 5 (internal citation and punctuation omitted).  The DCF defendants "acted properly in investigating possible abuse of [Wilmot's] daughter[s]."  Id.

Finally, even if this court were to find that the steps taken by the DCF employees were excessive, the allegations of the Complaint are insufficient to support a substantive due process violation.  "Where, as here, a plaintiff's substantive due process claim challenges the specific acts of a state officer, the plaintiff must show *both* that the acts were so egregious as to shock the conscience *and* that they deprived him of a protected interest in life, liberty, or property."  Pagan, 448 F.3d at 32.  The DCF defendants' actions in following procedures to investigate the claims of abuse were not so "extreme and egregious," or "truly outrageous, uncivilized, and intolerable" so as to rise to the level of a due process violation.  Id. (citations omitted).  For this reason as well, the allegations that the investigation violated Wilmot's constitutional rights must be dismissed.

### The Central Registry

Wilmot also contends that the inclusion of his name in the Central Registry violated his constitutional rights, interfered with his ability to engage in activities, for profit and otherwise, with minors, and tarnished his reputation.  Under the facts as alleged in the Complaint, Wilmot has established that he is entitled to some procedural due process in connection with his inclusion in the Registry.  However, in light of Wilmot's failure to exercise his right to appeal the inclusion of his name, Wilmot has failed to state a claim that his due process rights have been violated.

There are cases which hold that the inclusion of one's name in the Central Registry does not in and of itself implicate any protected liberty interest where the only injury suffered is being stigmatized.  See Howard v. Malac, 270 F. Supp. 2d 132, 141-42 (D. Mass. 2003), and cases cited.  However, "the cases suggest there is a core interest in reputation which is protected from interference by individualized government action" where, in addition to stigma, an individual suffers an "unusually serious harm, . . . as evidenced by the fact that employment (or some other right or status) is affected." Beitzell v. Jeffrey, 643 F.2d 870, 878 (1st Cir. 1981) (footnote omitted).  In the instant case, Wilmot has alleged that as a result of his inclusion in the Central Registry he cannot pursue employment and athletic opportunities for playing "super scoreball," "a new sport which involved significant contact with minors."  Compl. ¶¶ 197, 203, 205.  Based on these allegations, "it cannot be said at this juncture that the decision [of DCF] to support allegations against [Wilmot] did not activate due process concerns.  Thus, [Wilmot] was

entitled to some meaningful opportunity to be heard in relation to that decision." <u>Pease</u>, 719 F. Supp. 2d at 154.

Even recognizing that DCF's "decisions to support allegations of abuse and to list alleged perpetrators in its central registry implicate due process protections[,]" Wilmot's claim that his constitutional rights were violated must fail. <u>See</u> <u>Covell</u>, 439 Mass. at 787-88, 791 N.E.2d at 893. The procedural safeguards set forth in the Massachusetts statutory scheme comply with due process requirements. <u>Pease</u>, 719 F. Supp. 2d at 154. These safeguards include the right to a hearing before a hearing officer at which the aggrieved party may be represented by counsel and present and cross-examine witnesses, along with a right to judicial review. <u>Id.</u>[9] The right to appeal, pursuant to Mass. Gen. Laws ch. 30A, includes an appeal to the Massachusetts Superior Court, Appeals Court and Supreme Judicial Court. <u>See</u> <u>Covell</u>, 439 Mass. at 767, 791 N.E.2d at 879-80. "As a matter of law," "this process is constitutionally adequate." <u>Hopkins</u>, 491 F. Supp. 2d at 277. Since Wilmot failed to avail himself of any of these rights to review, his contention that his due process rights were violated must be dismissed.[10]

---

[9] The statutory framework in Massachusetts differs significantly from that described in <u>Valmonte v. Bane</u>, 18 F.3d 992 (2d Cir. 1994), on which Wilmot relies. <u>See</u> <u>Compl.</u> ¶ 201. Unlike the New York process, where "the risk of erroneous deprivation based on the original 'some credible evidence' standard was unacceptably high[,]" the Massachusetts statutory scheme requires the DCF to apply a "reasonable cause to believe" standard with a "full panoply of rights to judicial review," which safeguards the aggrieved person's constitutional rights. <u>Lindsay v. Dep't of Social Servs.</u>, 439 Mass. 789, 803 n.12, 791 N.E.2d 866, 876 n.12.

[10] In light of this conclusion, this court will not address the defendants' contention that Wilmot's claim also must fail because he failed to identify the individual defendants engaged in placing his name in the Registry.

For all these reasons, this court recommends that Counts I-VI of the Complaint be dismissed.

### B.    Supervisory Liability (Count VII)

Count VII of the Complaint purports to state a claim of "Supervisory Liability" under 42 U.S.C. § 1983 against the defendants Burns, Gemski, Connelly and McClain. Without identifying any defendant in particular, Wilmot contends that "[i]t was the policy and practice of the defendants, to fail to properly supervise, train and control the rank and file Social Workers" and to authorize improper methods of investigation.  Compl. ¶¶ 285-89.  In addition, Wilmot contends that the defendants "conspired" to violate his constitutional rights.  Id. ¶ 290.  For the reasons detailed herein, this court recommends that this Count be dismissed.

"[S]upervisory liability cannot be predicated on a respondeat superior theory. Supervisors may only be held liable under § 1983 on the basis of their own acts or omissions."  Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005) (internal citation omitted).  Accordingly, as the First Circuit has explained,

> [i]n the context of Section 1983 actions, supervisory liability typically arises in one of two ways: either the supervisor may be a "primary violator or direct participant in the rights-violating incident," or liability may attach "if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation."

Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009) (quoting Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999)).  Thus, "[a]bsent participation in the challenged

conduct . . . a supervisor may be held liable for the acts of a subordinate if: (1) the subor-

dinate's behavior results in a constitutional violation and (2) the supervisor's action or

inaction was 'affirmatively linked' to the behavior in that it could be characterized as

'supervisory encouragement, condonation or acquiescence' or gross negligence amount-

ing to 'deliberate indifference.'" Schofield v. Clarke, 769 F. Supp. 2d 42, 51 (D. Mass.

2011) (quoting Hegarty v. Somerset Cnty., 53 F.3d 1367, 1379-80 (1st Cir. 1995)). See

also Jaundoo v. Clarke, 690 F. Supp. 2d 20, 31 (D. Mass. 2010).  Applying these

principles to the instant case compels the conclusion that this Count must be dismissed.

### Connelly and McClain

As an initial  matter, other than alleging that Connelly was an Area Program

Manager of the South Central Office of DCF, see Compl. ¶ 5, there are no allegations of

any wrongdoing on her part, or any identification of any role she may have played.

Therefore, the claims against her should be dismissed.  See Schofield, 769 F. Supp. 2d at

51 (absent allegations that a supervisor participated in the challenged conduct or facts

establishing a connection between an alleged failure to supervise and the alleged harm,

claims against supervisor are dismissed).  Similarly, McClain is identified as the

Commissioner of DCF who "is being sued solely in his official capacity as leader of

agency at fault." Compl. ¶ 3.  Not only does the Complaint fail to contain any specific

allegations of wrongdoing on the part of the Commissioner, but it also is "well settled"

that "a state official acting in his official capacity" cannot be sued for damages in an

action alleging violations of 42 U.S.C. § 1983. Wang v. N.H. Bd. of Registration in

Med., 55 F.3d 698, 700 (1st Cir. 1995), and cases cited.  For these reasons, the claims

against McClain should be dismissed.

### Gemski and Burns

Wilmot alleges that Gemski was employed as an Area Program Manager of the

South Central Office of DCF, and that Burns was employed as a supervisor for DCF.

Compl. ¶¶ 6-7.  According to the Complaint, Tracey met with Burns and Gemski "to

discuss the current status and case direction[,]" which resulted in the recommendation

that the daughters engage in treatment "specific to victims of sexual abuse" and that

Wilmot "engage in a sexual offender evaluation" despite the defendants' knowledge that

the claims of sexual abuse had been found to be unsupported.  Id. ¶¶ 224-26.  For the

reasons detailed herein, these allegations are insufficient to state a claim for supervisory

liability.

As an initial matter, Wilmot has not established either factually or legally that

DCF's proposal that he undergo a sexual offender valuation violated his constitutional

rights.  The Complaint is silent as to whether he actually engaged in the evaluation or

what it entailed.  In addition, although DCF initially found the charge of sexual abuse to

be unsupported, according to the Complaint, Tracey subsequently received information

that one of the girls had reported to her boyfriend that she had been sexually abused, and

there were reports that one of the daughters was acting in a "bizarre" manner.  Under

such circumstances, it was objectively reasonable for Tracey, Gemski and Burns to

propose sexual abuse treatment for the daughters and a further evaluation of Wilmot.

Thus, the allegations do not sustain a finding that these supervisors violated Wilmot's constitutional rights by their own actions.

Moreover, the allegations are insufficient to state a claim that these supervisors were "deliberately indifferent" to the possibility that Wilmot's constitutional rights might be violated.  To the extent that Wilmot is challenging Gemski's and Burns' roles in establishing policy or engaging in supervision and training, he has failed to put forth facts identifying the policy at issue or what training was allegedly omitted.  Generalized allegations of a failure to train and supervise are insufficient to state a claim.  See Jaundoo, 690 F. Supp. 2d at 32-33, and cases cited.  Furthermore, deliberate indifference on the part of the supervisors "will be found only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights.  The 'affirmative link' requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation."  Hegarty, 53 F.3d at 1379-80 (internal citations omitted).  Because the Complaint lacks any allegations of fact which would support such a link, Wilmot has not alleged a claim against Gemski and Burns for supervisory liability under § 1983.

For all these reasons, Count VII of the Complaint should be dismissed.

**C.    Intentional/Negligent Infliction of Emotional Distress (Count VIII)**

In Count VIII, Wilmot contends that all the DCF defendants are liable for intentional or negligent infliction of emotional distress.  For the reasons detailed herein, this Count should be dismissed.

This court recognizes that if, as this court recommends, all the federal claims are dismissed, a federal court may decline to exercise pendant jurisdiction over the state law claim.  See 28 U.S.C. § 1367; Pease, 719 F. Supp. 2d at 155 ("In the absence of a cognizable federal claim forming the basis of the subject matter jurisdiction, this court declines to exercise supplemental jurisdiction over any pendant state law claims alleged in the Complaint.").  Furthermore, this court recognizes that "the balance of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over state law claims where the foundational federal claims have been dismissed at an early stage in the litigation."  Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998).  However, in light of the fact that there is no basis to state a claim for intentional or negligent infliction of emotional distress against the DCF defendants, this court concludes that this is "an instance in which the exercise of supplemental jurisdiction is warranted to dispose of frivolous claims."  Freeman v. Town of Hudson, 849 F. Supp. 2d 138, 143 (D. Mass. 2012).  Thus, this court recommends that Count VIII be dismissed on the merits.

## Claims Against DCF

To the extent Wilmot's emotional distress claims purport to apply to the DCF, they must be dismissed.  "As a general matter, states are immune under the Eleventh Amendment from private suit in the federal courts, absent their consent.  This immunity extends to any entity that is an arm of the state." Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 99 (1st Cir. 2002) (internal citations and quotations omitted).  Because DCF is a state agency, it "is protected by the state's immunity from suit under the Eleventh

Amendment, unless that immunity is waived." Adams v. Cousins, Civil Action No. 06-40117-FDS, 2009 WL 1873584, at *6 (D. Mass. Mar. 31, 2009) (slip op.).

The Massachusetts Tort Claims Act ("MTCA") "abrogates the doctrine of sovereign immunity and allows a suit against a public entity, but only to the extent provided in the statute." Titus v. Town of Nantucket, 840 F. Supp. 2d 404, 411 (D. Mass. 2011). Thus, under Section 2 of the MTCA,

> Public employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances ....

Mass. Gen. Laws ch. 258, § 2. However, under Section 10(c) of the MTCA, public employers remain immune from "any claim arising out of an intentional tort[.]" Mass. Gen. Laws ch. 258, § 10(c). Accordingly, Wilmot cannot maintain a claim against the DCF for intentional infliction of emotional distress.

Moreover, Wilmot has failed to state a claim against DCF for negligent infliction of emotional distress. To state such a claim, Wilmot must establish "1) negligence; 2) emotional distress; 3) causation; 4) physical harm manifested by objective symptoma-tology; and 5) that a reasonable person would have suffered emotional distress under the circumstances of the case." Godette v. Stanley, 490 F. Supp. 2d 72, 81 (D. Mass. 2007) (quoting Payton v. Abbott Labs, 386 Mass. 540, 557, 437 N.E.2d 171, 181 (1982)). While the physical harm requirement includes "symptoms that could be classified as more 'mental' than 'physical[,]'" the allegations must go beyond "mere upset, dismay,

-34-

humiliation, grief and anger." Gutierrez v. Mass. Bay Transp. Auth., 437 Mass. 396,

412, 772 N.E.2d 552, 566 (2002) (additional quotations and citations omitted).  Here,

Wilmot has not alleged any physical harm arising from the DCF's allegedly negligent

conduct.  Therefore, this claim must fail.[11]

### Claims Against the Individual Defendants

Wilmot has not alleged any federal claims against the individual DCF defendants

Contarino, Tonelli, Fogle, Carlo, Nisenbaum, Peet, Murray and Alicea.  Therefore, this

court lacks subject matter jurisdiction over them and Count VIII should be dismissed.

Fed. R. Civ. P. 12(b)(1); 28 U.S.C. §§ 1331, 1332.  Moreover, with respect to all of these

individual defendants, Wilmot has not alleged any facts to support his contention that

they were involved in conduct which caused him emotional distress.  Contarino is

identified only as the Area Director of the South Central Office of DCF, Compl. ¶ 4;

Murray is identified as "Deputy Regional Council [sic]," id. ¶ 12; and Alicea is identified

as a social worker employed by DCF.  Id. ¶ 11.  Fogle, Carlo, Nisenbaum and Peet are

not identified at all, other than being listed in the caption.  Absent any factual allegations

involving these defendants, the claims against them must be dismissed.

For similar reasons, the claims against Connelly and McClain must be dismissed.

Although, as detailed above, Wilmot has alleged slightly more against these supervisors

---

[11]   In light of this court's conclusion that Wilmot's emotional distress claims against the DCF should be dismissed on the grounds set forth above, this court will not address the DCF's argument that it is entitled to dismissal of these claims because Wilmot failed to allege compliance with the presentment requirements of the MTCA.

in that he has asserted, in a conclusory manner, that they failed to "supervise, train and control" the social workers and "conspired" to violate his constitutional rights, he has not detailed any facts which would support any findings of wrongdoing.  Therefore, the claims against these supervisors should be dismissed as well.

With respect to the remaining DCF defendants, the claims of infliction of emotional distress are either barred as a matter of law or Wilmot has failed to state a claim.  First, any claim of negligent infliction of emotional distress is barred by the MTCA, which provides that no "public employee shall be liable for any injury . . . caused by his negligent or wrongful act or omission while acting within the scope of his office of employment[.]"  Mass. Gen. Laws ch. 258, § 2.  Thus, the claims of negligent infliction of emotional distress must be dismissed as against the individual DCF defendants.

Second, to state a claim for intentional infliction of emotional distress, Wilmot must show (1) that the defendant "intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct[,]" (2) that the conduct was "extreme and outrageous," was "beyond all possible bounds of decency" and was "utterly intolerable in a civilized community[,]" (3) that the defendant's actions caused the plaintiff distress, and (4) that the plaintiff's emotional distress was severe.  Howell v. Enter. Publ'g Co., LLC, 455 Mass. 641, 672, 920 N.E.2d 1, 28 (2010) (citations omitted).  Wilmot has not alleged any such conduct.

With respect to Tonelli, the allegations are that she assigned "Polenski and Foley to investigate the incidents on an emergency basis, even though it was clear, or should

have been clear, that no emergency existed as there was zero evidence of injury, and no previous report or complaint existed in regard to the children at the police station." Compl. ¶ 144.  Such allegations fail to state a claim of intentional infliction of emotional distress and are belied by the Complaint itself.  As detailed above, Michelle allegedly presented an articulate and "air-tight" story of ongoing physical and sexual abuse, which was supported by the two girls.  Therefore, it was reasonable to err on the side of caution and call for a prompt investigation as provided in the statutory scheme, regardless of whether conflicting evidence would eventually show that an emergency response was unnecessary.  By carrying out her duties, Tonelli did not engage in "extreme and outrageous" conduct.

Similarly, the allegations relating to the actions undertaken by Polenski, Foley, Tracey, Burns and Gemski in investigating the charges of abuse do not state a claim for intentional infliction of emotional distress.  For all the reasons described above which have lead this court to conclude that there was no violation of Wilmot's constitutional rights and/or that these defendants are entitled to qualified immunity, Wilmot has failed to state a claim of conduct so extreme as to constitute intentional infliction of emotional distress.  Consequently, Count VIII should be dismissed.

### D.  **Declaratory Judgment (Count XVIII)**

In the final Count of his Complaint, Wilmot is seeking a declaratory judgment "that when the Department of Social Services makes a finding under its lawful jurisdiction that no abuse or neglect occurred, that finding collateral [sic] stops a criminal prose-

cution on a criminal charge which has the same elements as the abuse or neglect."[12]
Compl. ¶ 324.  This Count fails to state a claim for a variety of reasons.

As an initial matter, neither the DCF defendants, nor any of the other defendants, are the appropriate parties to defend such a claim.  "Broadly speaking, it is within the discretion of the legislature to define the elements of statutory offenses."  United States v. Pitrone, 115 F.3d 1, 7 (1st Cir. 1997).  Because the defendants in this case have no role in defining the parameters of a criminal offense, they are not capable of carrying out the requested relief, and are not properly named as defendants in Count XVIII.  See Mangual v. Rotger-Sabat, 317 F.3d 45, 57 (1st Cir. 2003) (where plaintiff challenges a state statute, "the proper defendants are the government officials whose role it is to administer and enforce it").

Additionally, "[d]eclaratory judgments are . . . limited to actual controversies as distinguished from disputes which are hypothetical, abstract or moot."  Ferreira v. Dubois, 963 F. Supp. 1244, 1262 (D. Mass. 1996).  "A declaratory judgment is generally moot where the question presented for decision seeks a judgment upon a matter which, even if the sought judgment were granted, could not have any practical effect upon the parties."  Id. (quotation and citation omitted).  Here, the record establishes that Wilmot was acquitted of the criminal charges that were brought against him in the Dudley District

---

[12]  Wilmot refers in this Count of the Complaint to the Department of Social Services, which is the former name of DCF.  The name change occurred in July 2008.  See Hootstein v. Collins, 670 F. Supp. 2d 110, 111 n.1 (D. Mass. 2009).

Court.  Accordingly, even if his declaratory judgment claim were resolved in his favor, it would have no practical effect upon the parties.  Therefore, Count XVIII is moot and should be dismissed.

Finally, this court finds that Count XVIII should be dismissed because this court is without authority to grant the requested relief.  As described above, it is the legislature, not the courts, which has authority to establish the elements of a criminal offense, and it is not up to this court to determine that criminal prosecutions may not proceed simply because the DCF has determined that no abuse or neglect has occurred.  Furthermore, "federal courts have no jurisdiction to entertain suits that seek to require that a state official comply with state laws or regulations."  Hootstein, 670 F. Supp. 2d at 115 (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106, 104 S. Ct. 900, 911, 79 L. Ed. 2d 67 (1984)).  Thus, to the extent Wilmot contends that as a matter of state law, state criminal prosecutions should be barred in circumstances where the DCF has found no abuse or neglect, this court has no jurisdiction over his claim.  For these reasons as well, Count XVIII fails to state a claim.

For all the reasons detailed herein, this court recommends that the motions to dismiss of the DCF defendants (Docket Nos. 36, 47, 51) be ALLOWED.

## V.   CLAIMS AGAINST OXFORD DEFENDANTS[13]

### A.   Section 1983 Claims Against Greene and Hassett (Counts IX-XV)

Defendants Greene and Hassett were Oxford Police Officers at the relevant times, and are being sued in their individual capacities.  Compl. ¶¶ 14-15.[14]  In his claims against these Officers brought pursuant to 42 U.S.C. § 1983, Wilmot contends that they violated his Fourth Amendment rights by seeking and obtaining a warrant for his arrest without probable cause, id. ¶¶ 295-98, and that they violated his Fourth and Fourteenth Amendment rights by maliciously prosecuting the criminal action against him.  Id. ¶¶ 304-07.  For the reasons detailed herein, this court concludes that all these claims should be dismissed either because Wilmot has failed to state a claim or because the defendants are entitled to qualified immunity.[15]

### False Arrest

"The Fourth Amendment right to be free from unreasonable seizures of the person demands that an arrest be supported by probable cause."  Santiago v. Fenton, 891 F.2d 373, 383 (1st Cir. 1989).  "Probable cause will be found if - and only if - the facts and

---

[13]  As detailed herein, Wilmot only alleges claims against Oxford defendants Greene and Hassett, and the Town of Oxford itself.  Therefore, the other Oxford defendants should be dismissed from this case.

[14]  While there are references to the defendants acting in their official capacities, see, e.g., Compl. ¶ 263, Wilmot has made it clear in the introductory paragraphs of the Complaint that the individual Oxford defendants are being sued only in their individual capacities.  See id. ¶¶ 14-17.

[15]  The standards under 42 U.S.C. § 1983 and for qualified immunity are discussed in detail above, and will not be repeated here.

circumstances of which the arresting officer has knowledge are sufficient to lead an ordinarily prudent officer to conclude that an offense has been, is being, or is about to be committed, and that the putative arrestee is involved in the crime's commission.  Accordingly, the standard to apply in evaluating the existence of probable cause and the legality of the ensuing arrest is an objective one; as long as the circumstances surrounding the event warrant the officer's reasonable belief that the action taken is appropriate, the arrest is justified.  Finally, though probable cause requires more than mere suspicion, it does not require the same quantum of proof as is needed to convict." Sheppard v. Aloisi, 384 F. Supp. 2d 478, 488 (D. Mass. 2005) (internal footnote, quotations and citations omitted).

It is well established that police officers sued under § 1983 for false arrest may claim qualified immunity. Malley, 475 U.S. at 341, 106 S. Ct. at 1096.  The question "is whether a reasonably well-trained officer in [the defendants'] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." Id. at 336, 106 S. Ct. at 1094.  "[I]mmunity will issue when 'officers of reasonable competence could disagree' on the lawfulness of the action, but it will not issue if 'it is obvious that no reasonably competent officer would have concluded' that the action was lawful. Lopera v. Town of Coventry, 640 F.3d 388, 396 (1st Cir. 2011) (quoting Malley, 475 U.S. at 341, 106 S. Ct. at 1096).  Qualified immunity "requires a somewhat lesser showing" than probable cause. Cox v. Hainey, 391 F.3d 25, 31 (1st Cir. 2004).

In the instant case, it is undeniable that the constitutional right to be free from arrest without probable cause was well established at the time of Wilmot's arrest in 2009. See Santiago, 891 F.2d at 386 ("The right to be free from unreasonable seizures of the person was well established long before 1983."). The allegations of the Complaint, however, establish that a reasonable officer could have concluded that there was probable cause for the arrest.[16] Thus, regardless whether there actually was probable cause for the arrest, the defendants are entitled to qualified immunity.

Michelle and the two girls all asserted that there had been physical and sexual abuse. Although he denied engaging in any abusive behavior, Wilmot did admit to conduct which a reasonable police officer could consider to be physical abuse. More-over, while the charge of sexual abuse was found to be not supported by DCF, as detailed above, there was evidence subsequent to that conclusion on which the police officers could rely in bringing the sexual assault charge. In addition, DCF remained concerned about whether there was sexual abuse, and recommended treatment for the daughters and an evaluation of Wilmot. Under such circumstances, Wilmot's arrest "was not obviously unlawful at the time it was made" and while the officers may have misinterpreted the

---

[16] No party has provided any information about what was actually submitted to the court in order to obtain the arrest warrant. Wilmot has simply alleged that "the defendants maliciously and with intent to injure plaintiff Mark Wilmot, caused the issuance of a warrant for the arrest of Mark Wilmot without probable cause...." Compl. ¶ 295. Recognizing that the burden is on the party seeking qualified immunity, Williams v. City of Boston, 771 F. Supp. 2d 190, 203 (D. Mass. 2011), Wilmot's conclusory allegations nevertheless are simply insufficient to establish that the defendants acted with malice and without probable cause. See Iqbal, 556 U.S. at 679, 129 S. Ct. at 1950.

information they had, they were not obligated to accept Wilmot's denials.  <u>Sheppard</u>, 384

F. Supp. 2d at 491, and cases cited.  Since probable cause "was at least arguable" at the

time, the allegations of the Complaint establish that qualified immunity shields the

officers from the false arrest claim.  <u>Id.</u>

### **Malicious Prosecution**

Wilmot's claim under § 1983 of a violation of his Fourth and Fourteenth Amend-

ment rights on the grounds of malicious prosecution is equally unavailing.  "To recover

for malicious prosecution under Massachusetts law, [Wilmot] had to show four elements:

(1) that the defendant initiated a criminal action against him; (2) that the criminal prose-

cution ended in [Wilmot's] favor; (3) that there was no probable cause to initiate the

criminal charge; and (4) that the defendant acted maliciously."  <u>Santiago</u>, 891 F.2d at

387.  Even assuming proof of all these elements, "more is needed to transform malicious

prosecution into a claim cognizable under section 1983. . . . To bridge the gap, the

plaintiff also must show a deprivation of a federally-protected right."  <u>Nieves v.</u>

<u>McSweeney</u>, 241 F.3d 46, 53 (1st Cir. 2001).

"It is well-established that malicious prosecution does not support a claim of a

substantive due process violation, so that cannot be the constitutional violation which

supports a § 1983 claim."  <u>Sheppard</u>, 384 F. Supp. 2d at 491 (citing <u>Nieves</u>, 241 F.3d at

53) (additional citations omitted).  Moreover, '[n]o procedural due process claim can

flourish in this soil because Massachusetts provides an adequate remedy for malicious

prosecution."  <u>Nieves</u>, 241 F.3d at 53, and cases cited.  Thus, to the extent that Wilmot

bases his § 1983 malicious prosecution claim on an alleged violation of his Fourteenth Amendment rights, it must fail.

It remains "an open question whether the Constitution permits the assertion of a section 1983 claim for malicious prosecution on the basis of an alleged Fourth Amendment violation." Id. at 54, and cases cited.  Assuming, arguendo, that it does, the facts here do not support a constitutional violation.

"The essence of malicious prosecution is the perversion of proper legal procedures. . . . Ordinarily, this legal process will be either in the form of a warrant, in which case the arrest itself may constitute the seizure, . . . or a subsequent arraignment, in which case any post-arraignment deprivations of liberty (such as being bound-over for trial) might satisfy this constitutional requirement."  Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 117 (2d Cir. 1995) (internal quotations and citations omitted), cited with approval in Nieves, 241 F.3d at 53.  For the reasons discussed above, the allegations of the Complaint establish that it was reasonable for the defendants to conclude that there was probable cause for the arrest.  Therefore, Wilmot has failed to establish that his seizure as a result of his arrest was wrongful.

The events which transpired after his arrest do not rise to the level of a "seizure" so as to support a Fourth Amendment violation.  Accepting Wilmot's allegations as alleged in the Complaint as true, he was released on his own recognizance, appeared in court a number of times, including through trial, and suffered stress and anxiety.  Such

facts do not rise to the level of a Fourth Amendment seizure "sufficient to ground a section 1983 malicious prosecution claim[.]"  Nieves, 241 F.3d at 55.

In sum, Wilmot has not established a violation of his constitutional rights either on the grounds of false arrest or malicious prosecution.  Therefore, this court recommends that the § 1983 claims against Greene and Hassett (Counts IX-XV) be dismissed.

### B.        State Law Claims Against Greene and Hassett (Counts XV and XVI)

Wilmot has brought state law claims for malicious prosecution and intentional/ negligent infliction of mental distress against Greene and Hassett.[17]  For the reasons detailed herein, this court recommends that the federal court exercise jurisdiction over these claims.  This court makes this recommendation because the statute of limitations may otherwise run on Wilmot's claims.  Nevertheless, this court recommends that the claims be dismissed for failure to state a claim.

In light of the dismissal of the federal claims against Greene and Hassett, the federal court may decline to exercise pendant jurisdiction over these state law claims.  As detailed above in connection with the DCF defendants, federal courts generally decline to exercise jurisdiction over state law claims where the federal claims are dismissed early in the litigation.  Camelio, 137 F.3d at 672.  Nevertheless, exercise of the federal court's jurisdiction may be appropriate here, since "[t]he running of the statute of limitations on a

---

[17]  While Count XV purports to repeat Count XII and state a claim for malicious prosecution under 42 U.S.C. § 1983, this court will assume that Count XV is intended to be a state law claim for malicious prosecution.

pendent claim, precluding the filing of a separate suit in state court, is a salient factor to be evaluated when deciding whether to retain supplemental jurisdiction." O'Connor v. Commonwealth Gas Co., 251 F.3d 262, 273 (1st Cir. 2001) (quoting Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995)).  In the instant case, a three-year statute of limitations applies to the state claims.  Wilmot's claim of malicious prosecution will be time-barred as of July 2013, leaving him little time to pursue his state law claim. See Nieves, 241 F.3d at 53 (claim of malicious prosecution accrues upon the termination of criminal proceedings which, in Wilmot's case, was July 2010).  Moreover, his claim of infliction of emotional distress may be deemed to have accrued by no later than the time of his arrest, in July 2009.  See id. (in general, claims against police accrue when the action occurs).[18]  Under such circumstances, if this court declines to exercise its jurisdiction over this claim, Wilmot will not be able to pursue it in state court as it would be time-barred.  Consequently, this court recommends that the federal court exercise pendent jurisdiction over Wilmot's state law claims.  Nevertheless, for the reasons detailed herein, this court recommends that the state law claims be dismissed.

### Malicious Prosecution

As noted above, among the elements that Wilmot has to establish in order to recover for malicious prosecution under Massachusetts law are that there was no probable cause to initiate the criminal charge and that the defendants acted maliciously.  Santiago,

---

[18]  As no party has addressed when the causes of action accrued, this Report and Recommendation should not be interpreted as a ruling on when the claims accrued as a matter of law.

891 F.2d at 387.  For the reasons detailed above, Wilmot has failed to allege sufficient

facts to support a finding that there was no probable cause to initiate the charges against

him.  Moreover, there are no factual allegations to establish that the police acted

maliciously toward him.  "The malice element of malicious prosecution requires that the

accuser knew there was no probable cause for the commencement of the action, and that

the accuser acted with an improper motive."  Gouin v. Gouin, 249 F. Supp. 2d 62, 71 (D.

Mass. 2003), and cases cited.  The conclusory allegations of the Complaint that the

defendants acted maliciously, without any factual allegations to support an improper

motive, are insufficient to state a claim.  See Iqbal, 556 U.S. at 679, 129 S. Ct. at 1950.

Therefore, this claim should be dismissed.

### Infliction of Mental Distress

For the same reasons as in the case of the DCF employees, the claim of negligent

or intentional infliction of emotional distress against Greene and Hassett should be

dismissed.  A claim of negligent infliction of emotional distress against these individuals

is barred by the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258, § 2.  Further-

more, the conduct alleged does not rise to the level of intentional infliction of emotional

distress.  "While it is reasonable to conclude that, for most people, arrest is a traumatic

experience, especially if the charges later prove to be false[,] this factor alone does not

give rise to a claim for intentional infliction of emotional distress."  Sheppard, 384 F.

Supp. 2d at 495 (internal punctuation, quotation and citation omitted).  Here, there are no

allegations beyond facts showing that the police pursued a criminal charge for which

there was probable cause.  Under such circumstances, the conduct alleged cannot be deemed extreme and outrageous.

For these reasons, this court recommends that the state law claims against Greene and Hassett (Counts XV and XVI) be dismissed.

### C.    Claim Against Town of Oxford (Count XVII)

In Count XVII, Wilmot purports to state a claim against the Town of Oxford, pursuant to 42 U.S.C. § 1983, asserting "municipal liability for Fourth Amendment violations under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)."  Compl. Count XVII.  Therein, Wilmot alleges that defendant Boss, as the Chief of the Oxford Police Department, was the final policymaker and decision-maker regarding the investigation and the decision to arrest Wilmot.  For the reasons detailed herein, this Count should be dismissed.

"Generally, a municipality may be liable under section 1983 if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation."  Haley v. City of Boston, 657 F.3d 39, 51 (1st Cir. 2011) (quoting Connick v. Thompson, – U.S. – , 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 706, 98 S. Ct. 2018, 2043, 56 L. Ed. 2d 611 (1978))).  "However, municipalities are not vicariously liable under section 1983 for the actions of their non-policymaking employees.  They are responsible only for their own unconstitutional acts.  Thus, a plaintiff who brings a section 1983 action against a municipality bears the burden of showing that, through its deliberate

-48-

conduct, the municipality was the moving force behind the injury alleged. Such a plaintiff must identify a municipal policy or custom that caused the plaintiff's injury." Id. (emphasis, internal quotations and citations omitted). Moreover, "policy or practice aside, a municipality cannot be liable for the actions of its officials under Monell if those actions 'inflicted no constitutional harm.'" Robinson v. Cook, No. 12-1722, 2013 WL 238772, at *8 (1st Cir. Jan. 23, 2013) (quoting City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573, 89 L. Ed. 2d 806 (1986)).

In the instant case, Wilmot's Monell claim must fail both because he has failed to establish a constitutional harm and because he has not identified the custom or practice at issue. All that he has alleged is that the Chief of Police was the final policymaker or decision-maker in the decision to arrest him allegedly without probable cause. See Compl. ¶¶ 318-322. This asserts no more than respondeat superior or vicarious liability, and is insufficient to state a claim. See Santiago, 891 F.2d at 381.

Furthermore, Wilmot has failed to allege facts to support a conclusion that his arrest was without probable cause. Moreover, Wilmot has failed to "demonstrate both the existence of a policy or custom and a causal link between that policy and the [alleged] constitutional harm." Id. Consequently, he has failed to state a claim of municipal liability, and Count XVII should be dismissed.

### D.    Declaratory Judgment (Count XVIII)

Count XVIII of the Complaint purports to state a claim for a declaratory judgment and purports to apply to all defendants. For all the reasons detailed above in connection

with the DCF defendants, this Count fails to state a claim, and should be dismissed as to the Oxford defendants as well.

For all these reasons, this court recommends that the Oxford defendants' motion to dismiss (Docket No. 34) be ALLOWED.

## VI.   CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that all the Motions to Dismiss (Docket Nos. 34, 36, 47 and 51) be ALLOWED.[19]

     / s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge

---

[19]   The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).